990 So.2d 503 (2008)
LAWNWOOD MEDICAL CENTER, INC., etc., Appellant,
v.
Randall SEEGER, M.D., etc., Appellee.
No. SC07-1300.
Supreme Court of Florida.
August 28, 2008.
*506 Stephen J. Bronis of Zuckerman, Spaeder, LLP, Miami, FL, and Charles W. Hall, William A. Kebler, and Mark D. Tinker of Fowler, White, Boggs and Banker, P.A., St. Petersburg, FL, for Appellant.
Major B. Harding of Ausley and McMullen, Tallahassee, FL, and Richard H. Levenstein of Kramer, Sewell, Sopko and Levenstein, Stuart, FL, for Appellee.
Harold R. Mardenborough, Jr., of Carr, Allison, Tallahassee, Florida on behalf of American Medical Association and Florida Medical Association, and Glenn J. Webber, Stuart, Florida on behalf of The Association of American Physicians and Surgeons, as Amici Curiae.
PARIENTE, J.
The issue before us is whether a special law passed by the Legislature violates the constitutional prohibition against special laws that grant a "privilege to a private corporation" set forth in article III, section 11(a)(12), of the Florida Constitution. Both the trial court and the First District Court of Appeal held that chapter 2003-372, Laws of Florida, entitled the "St. Lucie County Hospital Governance Law" (HGL), violated this constitutional provision. See Lawnwood Med. Ctr., Inc. v. Seeger, 959 So.2d 1222 (Fla. 1st DCA 2007). Because the HGL was declared unconstitutional, this Court is mandated to review this case under article V, section 3(b)(1), of the Florida Constitution. The parties do not dispute that the HGL is a special law applicable to private corporations only in St. Lucie County; instead, they dispute whether the HGL grants a privilege to a private corporation.[1] As more fully explained in this opinion, we conclude that the HGL impermissibly provides a privilege to Lawnwood Medical Center, Inc., a private corporation. Accordingly, we affirm the decision of the First District holding the law unconstitutional.[2]

FACTS AND PROCEDURAL HISTORY
Lawnwood Medical Center, Inc., is a for-profit corporation that owns and operates Lawnwood Regional Medical Center and Heart Institute in St. Lucie County, Florida. The corporation operates the hospital through its Board of Directors and through delegation of duties to the corporation's officers and Board of Trustees ("Board"). The Board's bylaws, which were adopted in 1988, state that the Board has final decision-making authority in the areas of credentialing, peer review, and quality assurance after considering the recommendations of the medical staff. In 1993, the medical staff at Lawnwood adopted the Medical Staff Bylaws, which were subsequently approved by the Board. The adoption of the Medical Staff Bylaws, although not the specific terms, was a requirement for Lawnwood to maintain its accreditation through the Joint Commission for the Accreditation of Healthcare Organizations. The Medical Staff Bylaws *507 state its purpose as providing "for the organization of the Medical Staff of Lawnwood Regional Medical Center to provide a framework of self-government in order to permit the Medical Staff to discharge its responsibilities in matters involving the quality of medical care and to govern the orderly resolution of those purposes."
After adoption of the Medical Staff Bylaws, several disputes arose between Lawnwood and the medical staff which generated multiple lawsuits. One controversy involved the medical services rendered by two pathologists, Dr. Leonard Walker and Dr. John Minarcik. Lawnwood requested that the medical staff, through the Medical Executive Committee (MEC),[3] conduct peer review as to Dr. Walker and Dr. Minarcik based on its assertion of their commission of health care fraud and a history of misdiagnoses. The parties dispute whether the medical staff initiated peer review procedures regarding the pathologists, but it is undisputed that the staff did not recommend any disciplinary action against the doctors. The Board then summarily suspended the privileges of Dr. Walker and Dr. Minarcik, but their privileges were reinstated by the trial court in a separate lawsuit filed by the doctors. See Lloyd v. Lawnwood Med. Ctr., Inc., No. 99-CA-001180BC, 2000 WL 309305, at *4 (Fla. 19th Cir.Ct. Feb. 16, 2000) (citing Walker v. Lawnwood Med. Ctr., Inc., No. 99-159 CA 03 (Fla. 19th Cir.Ct.1999) (order granting preliminary injunction)) aff'd, 773 So.2d 114 (Fla. 4th DCA 2000). The trial court order in Walker enumerated various options other than Lawnwood's unilateral suspension of the doctors that Lawnwood could utilize if it believed that the MEC was not discharging its responsibilities regarding peer review. The trial court's order was affirmed by the Fourth District Court of Appeal without opinion. Lawnwood Reg'l Med. Ctr. v. Walker, 746 So.2d 459, 1999 WL 1220180 (Fla. 4th DCA 1999).
Instead of following any of the options set out by the trial court in Walker, Lawnwood summarily removed the elected medical staff officers and the MEC. Once again, Lawnwood's unilateral actions were challenged in court. The trial court reinstated the individuals and again stated the legal options Lawnwood had available if it believed that the MEC was failing to "comply with the policies, procedures, or directives of the risk management program or any quality assurance committees of the hospital" pursuant to section 395.0193(3)(g), Florida Statutes (1999). Lloyd, 2000 WL 309305, at *4 n. 9. Instead of utilizing any of those options, the Lawnwood Board adopted new bylaws, which provided in part that the Board could unilaterally amend the Medical Staff Bylaws after exhausting reasonable attempts to gain medical staff approval. However, this new provision directly conflicted with the existing Medical Staff Bylaws, which required a vote of sixty percent or more of the medical staff for any substantive amendment. Thus, the medical staff deemed the new provision invalid.
At this point, Lawnwood sought relief from the Legislature. In 2003, the Legislature enacted the HGL as a special law.[4] *508 It is uncontroverted that the special law affected only the two private hospitals in St. Lucie County, which are both owned by the same private parent corporation. After enactment of the law, the Board presented the medical staff with proposed amendments to the Medical Staff Bylaws, this time to reflect the provisions of the HGL, but the medical staff rejected the amendments.
Lawnwood then brought a declaratory judgment action, seeking to have the HGL declared constitutional.[5] Dr. Randall Seeger, as president of the medical staff, opposed the Board's petition and both parties filed motions for summary judgment. In its Summary Final Judgment, the trial court first questioned whether a "special act is a constitutionally permissible method for affecting the internal business affairs of a private corporation." Without reaching that basic question, the trial court then proceeded to find the HGL unconstitutional on four grounds: (1) the law provided a privilege to a private corporation in violation of article III, section 11(a)(12), of the Florida Constitution; (2) the law unconstitutionally impaired the contract between the medical staff and the Board; (3) the law amended section 395.0193, Florida Statutes, by implication and did not reference the amendment in the law's title, in violation of article III, section 6, of the Florida Constitution; and (4) the law violated the equal protection clauses of the state and federal constitutions by creating two classes of hospitalsthe two private hospitals in St. Lucie County and all other hospitals in the state.[6]
On appeal, the First District concluded that the HGL "dramatically alters many of the rights and obligations specified in the contract between the appellant's medical staff and board of trustees," constituting an impermissible privilege and an impermissible impairment of contract. Lawnwood, 959 So.2d at 1224. The district court further concluded that the "legislation was not required to protect the public health, ensure the quality of care at Lawnwood, or accomplish some other legitimate public purpose." Id. It thus affirmed the trial court's rulings on the privilege and impairment of contract grounds and declined to address the other arguments.[7] Lawnwood now appeals the First District's holding that the HGL is unconstitutional.

ANALYSIS

Standard of Review
This Court reviews de novo a lower court's ruling on the constitutionality of a statute. Fla. Dep't of Children & Families v. F.L., 880 So.2d 602, 607 (Fla. 2004). We do not take lightly a contention that a statute passed by the Legislature is unconstitutional and we start with the well-established principle that a legislative enactment is presumed to be constitutional. See Fla. Dep't of Revenue v. City of Gainesville, 918 So.2d 250, 256 (Fla.2005). *509 In this case, however, the power of the Legislature is limited by the Florida Constitution itself, which prohibits the Legislature from passing certain special laws.[8] Specifically, article III, section 11(a)(12), states that "[t]here shall be no special law or general law of local application pertaining to . . . private incorporation or grant of privilege to a private corporation." Indeed, the language of article III, section 11(a)(12), acts as a limitation on legislative power. See generally Bush v. Holmes, 919 So.2d 392, 406 (Fla.2006) (citing Savage v. Bd. of Pub. Instruction, 101 Fla. 1362, 133 So. 341, 344 (Fla.1931) ("The Constitution of this state is not a grant of power to the Legislature, but a limitation only upon legislative power. . . .")).
According to article X, section 12(g), of the Florida Constitution, a special law is defined as "a special or local law." More specifically, a special law is
one relating to, or designed to operate upon, particular persons or things, or one that purports to operate upon classified persons or things when classification is not permissible or the classification adopted is illegal; a local law is one relating to, or designed to operate only in, a specifically indicated part of the state, or one that purports to operate within classified territory when classification is not permissible or the classification adopted is illegal.
Florida Dep't of Bus. & Prof'l Regulation v. Gulfstream Park Racing Ass'n, 967 So.2d 802, 807 (Fla.2007) (quoting State ex rel. Landis v. Harris, 120 Fla. 555, 163 So. 237, 240 (1934)). On the other hand, a general law is defined as "a statute relating to . . . subjects or to persons or things as a class, based upon proper distinctions and differences that inhere in or are peculiar or appropriate to the class." State ex *510 rel. Gray v. Stoutamire, 131 Fla. 698, 179 So. 730, 733 (1938).
The HGL states that it is "an act relating to St. Lucie County" and that it "clarifies the delineation of authority within each hospital within St. Lucie County." Ch.2003-372, § 1, at 448, Laws of Fla. Section 3 makes clear that the hospitals affected by the law are only those whose licenses are held by corporations. It is apparent from the express language in the HGL that the law was intended to affect only those privately operated hospitals located in St. Lucie County. Therefore, the HGL is unquestionably a special law affecting a private corporation.
This Court has previously confronted several cases where the Legislature passed a special law under the guise of a general law without meeting the constitutional requirements for passage. See St. Vincent's Med. Ctr., Inc. v. Mem'l Healthcare Group, Inc., 967 So.2d 794 (Fla.2007); Florida Dep't of Bus. & Prof'l Regulation v. Gulfstream Park Racing Ass'n, 967 So.2d 802 (Fla.2007); City of Miami v. McGrath, 824 So.2d 143 (Fla.2002); Dep't of Bus. Regulation v. Classic Mile, Inc., 541 So.2d 1155 (Fla.1989). Such is not the case here where the law was passed as a special law and specifically enacted to affect only private, corporately owned hospitals in St. Lucie County.

Article III, Section 11(a)(12) of the Florida Constitution
The constitutional issue in this case is whether the special law is unconstitutional as a prohibited grant of a privilege to a private corporation. Lawnwood argues that the "privilege" prohibited by the state constitution is "economic favoritism over other entities similarly situated." In response, Seeger asserts that "privilege" encompasses more than a financial benefit. This Court has never construed the phrase "grant of privilege to a private corporation" and thus this is a case of first impression.[9] Therefore, it is the duty of this Court to determine the meaning of this constitutional provision. Florida Comm'n on Ethics v. Plante, 369 So.2d 332, 336 (Fla.1979) (citing Alsdorf v. Broward County, 333 So.2d 457 (Fla.1976)).
Our goal in construing a constitutional provision is to ascertain and effectuate the intent of the framers and voters. See Caribbean Conservation Corp. v. Florida Fish & Wildlife Conservation Comm'n, 838 So.2d 492, 501 (Fla.2003). If the language used by the framers is clear, there is no need to resort to other tools of statutory construction. As stated by this Court in Ervin v. Collins, 85 So.2d 852 (Fla.1956):
We are called on to construe the terms of the Constitution, an instrument from the people, and we are to effectuate their purpose from the words employed in the document. We are not permitted to color it by the addition of words or the engrafting of our views as to how it should have been written. . . . As pointed out by the chancellor, it must be presumed that those who drafted the Constitution had a clear conception of the principles they intended to express, that they knew the English language and that they knew how to use it, that they gave careful consideration to the practical application of the Constitution and arranged its provisions in the order that would most accurately express their intention.
Id. at 855.
Thus, this Court's analysis begins with an examination of the explicit *511 language of the provision. Fla. Soc'y of Ophthalmology v. Fla. Optometric Ass'n, 489 So.2d 1118, 1119 (Fla.1986). "If that language is clear, unambiguous, and addresses the matter in issue, then it must be enforced as written." Id. Moreover, "[l]ess latitude is permitted when construing constitutional provisions because it is presumed that they have been more carefully and deliberately framed than statutes." Dep't of Envtl. Prot. v. Millender, 666 So.2d 882, 886 (Fla.1996).
Historically, this Court has resorted to dictionary references in defining terms contained in constitutional provisions. See Myers v. Hawkins, 362 So.2d 926, 930 (Fla.1978) ("[W]e initially consult widely circulated dictionaries, to see if there exists some plain, obvious, and ordinary meaning for the words or phrases approved for placement in the Constitution."); see also Sch. Bd. of Escambia County v. State, 353 So.2d 834, 838 (Fla. 1977) (using Webster's Third New International Dictionary (unabr.1960) to define "system" as used in article IX, section 1, Florida Constitution); Hillsboro Island House Condo. Apartments, Inc. v. Town of Hillsboro Beach, 263 So.2d 209, 213 (Fla. 1972) (relying on Black's Law Dictionary definition of "improvement" as it is used in article V, section 19, Florida Constitution). Thus, this Court has used both Black's and Webster's to define terms in constitutional provisions.
According to Black's Law Dictionary 1359 (4th ed.1968), "privilege" is defined in part as "a particular and peculiar benefit or advantage enjoyed by a person, company, or class, beyond the common advantage of other citizens." Webster's Seventh New Collegiate Dictionary 677 (7th ed.1967), defines "privilege" as "a right or immunity granted as a peculiar benefit, advantage, or favor."[10] The definitions provided by these dictionaries indicate that a "privilege" encompasses more than just a financial benefit. Although this Court has not defined "privilege" as used in article III, section 11(a)(12), it has defined "privilege" as used in excise tax laws as "a franchise or right granted one by the government." See City of Pensacola v. Lawrence, 126 Fla. 830, 171 So. 793, 795 (1937). Thus, the common theme of all of these definitions is that a privilege is a right, a special benefit, or an advantage.
Florida is not alone in adopting a constitutional prohibition against granting privileges to private corporations. Indeed, fourteen other states have similar prohibitions.[11] The Nebraska Supreme Court has defined "special privilege" in its constitution *512 as "a right, power, franchise, immunity, or privilege granted to or vested in a person or class of persons, to the exclusion of others and in derogation of common right." City of Plattsmouth v. Nebraska Tel. Co., 80 Neb. 460, 114 N.W. 588, 590 (1908). The United States Supreme Court in Old Colony Trust Co. v. City of Omaha, 230 U.S. 100, 115, 33 S.Ct. 967, 57 L.Ed. 1410 (1913), quoted with approval this definition given to the term "special privilege" by the Nebraska Supreme Court. The Missouri Supreme Court's definition mirrors that of the Nebraska high court. See State ex inf. Chaney v. W. Missouri Power Co., 313 Mo. 283, 281 S.W. 709, 713 (1926) (defining "special privilege" as a "right, power, franchise, immunity, or privileged [sic] granted to, or invested in, a person or class of persons to the exclusion of others and in derogation of common right"). Similarly, the Minnesota Supreme Court has defined "privilege" as "a right or immunity granted to a person either against or beyond the course of the common or general law." Dike v. State, 38 Minn. 366, 38 N.W. 95, 96 (1888).
These definitions from other state supreme courts construing similar provisions in their constitutions parallel the dictionary definitions as well as the common sense understanding of a "privilege" as connoting a special benefit, advantage, or right enjoyed by a person or corporation. In fact, we have followed the principle that, unless the text of a constitution suggests that a technical meaning is intended, words used in the constitution should be given their usual and ordinary meaning because such is the meaning most likely intended by the people who adopted the constitution. See, e.g., Advisory Opinion to Governor  1996 Amendment 5 (Everglades), 706 So.2d 278, 282 (Fla.1997). To this effect, "a dictionary may provide the popular and common-sense meaning of terms presented to the voters." Id. With respect to the term "privilege," the dictionary definitions are not limited to economic favoritism.
It is a well-established tenet of statutory construction that courts "are not at liberty to add words to the statute that were not placed there by the Legislature." State v. J.M., 824 So.2d 105, 111 (Fla.2002) (quoting Hayes v. State, 750 So.2d 1, 4 (Fla.1999)). This tenet applies equally to constitutional provisions. Thus, we are not at liberty to add words to article III, section 11(a)(12), which were not placed there by the drafters of the Florida Constitution. Because the drafters did not limit the term "privilege" by including a reference to only economic privileges, we conclude that the term "privilege" encompasses more than a financial benefit and includes a "right," "benefit," or "advantage" granted to a private corporation. Cf. City of Gainesville, 918 So.2d at 263-64 (stating that had the framers of article VII, section 3(a), wished to limit the applicability of its language exempting property used for "municipal or public purposes" from taxation, they could have specifically defined "municipal or public purposes" or used different terms); Coastal Florida Police Benevolent Ass'n v. Williams, 838 So.2d 543, 549-50 (Fla.2003) (concluding that the term "employees" in article I, section 6, of the Florida Constitution was intended to be applied in it broadest sense and was a comprehensive term that was not limited to a specific group of employees but included all employees).
We conclude that a broad reading of the term "privilege" as used in article III, section 11(a)(12),one not limiting the term to any particular type of benefit or advantageis required. This conclusion is also supported by the history surrounding article III, section 11(a)(12). The specific prohibition now contained in article III, *513 section 11(a)(12), was enacted as part of the 1968 Constitution. While provisions prohibiting special laws addressing certain other issues existed in the 1885 version of the Florida Constitution,[12] the 1968 revision added the specific provision barring grants of privileges to private corporations. Further, the 1968 Constitution strengthened many of the preexisting prohibitions against special laws.[13] One purpose of expanding the scope of prohibitions of special laws was to prevent state action benefiting local or private interests and to direct the Legislature to focus on issues of statewide importance.[14] Indeed, article *514 III, section 11's broad list of prohibitions reveals the drafters' concern for the restriction of local laws and the encouragement of uniformity in Florida law. Cf. Robert F. Williams, Equality Guarantees in State Constitutional Law, 63 Tex. L.Rev. 1195, 1209 (1985) ("[T]hese proscriptions on special and local laws reflect a concern for equal treatment under the law."). Therefore, it appears that the intent of the amendment broadening the list of prohibitions was to restrict the ability of the Legislature to pass special laws, and because the framers placed no limitations on the term "privilege" in article III, section 11(a)(12), we consider that a broad rather than a narrow reading of the term "privilege" is in accord with this intent.
Accordingly, we conclude that article III, section 11(a)(12), prohibits special laws granting rights, benefits, and advantages to a corporation; and the term "privilege" is not limited to economic benefit or favoritism. With this interpretation in mind, we now turn to an examination of the HGL.

The Hospital Governance Law
The HGL is composed of seven separate sections. For purposes of our analysis, however, we will focus on sections 1, 5, and 6.[15] Section 1 sets forth the Legislature's intent to provide consolidation of the Board's power, authority, duty, and ultimate responsibility under existing statutes in the areas of medical staff and clinical privileges and discipline, and compliance with statutorily mandated peer review, risk management, and quality assurance activities. Section 1 also provides that if the Board's bylaws conflict with the Medical Staff Bylaws, the Board's bylaws will always "prevail with respect to medical staff privileges, quality assurance, peer review, and contracts for hospital-based services."[16]
Section 5 provides the Board with the right to reject or modify a medical staff recommendation or take action independent of the medical staff in the areas of medical staff membership, clinical privileges, peer review, and quality assurance under stated circumstances. Section 5 also reiterates that if the bylaws of the Board and the medical staff conflict, the bylaws of the Board will control with respect to medical staff privileges, quality assurance, peer review, and contracts for *515 hospital-based services.[17]
Finally, section 6 of the HGL contains the detailed procedures to be followed when the Board seeks to modify a medical staff recommendation or where the medical staff has failed to act after a Board request in the areas of medical staff membership, clinical privileges, peer review, or quality assurance.[18]
Under section 6 of the HGL, the Board's independent action on a medical staff recommendation is subject to "a fair hearing process." If, after the "fair hearing," the board determines corrective or disciplinary *516 action is necessary, proposed board action is then recommended to a conference committee made up of three members of the governing board and three members of the medical staff. If the conference committee recommends other action, the HGL provides that the Board shall not unreasonably reject that recommendation, but the Board's decision on the matter will be final if the conference committee agrees or if the conference committee reaches no majority decision.

Whether the HGL Grants a Privilege
With these pertinent provisions of the law set forth, we will now address whether these provisions grant a privilege to Lawnwood in contravention of article III, section 11(a)(12), of the Florida Constitution. Collectively, sections 1 and 5 provide the hospital with a complete override of any medical staff bylaws in the event of a conflict between the bylaws. The override extends not just to peer review but also to bylaws involving "medical staff privileges, quality assurance, and contracts for hospital-based services." Moreover, while section 5 refers to the Board's obligation to "carefully consider[ ]" the medical staff's recommendations and response regarding a Board-proposed amendment to the Medical Staff Bylaws, this section grants the Board the right and power to unilaterally amend the Medical Staff Bylaws, something it could not do before enactment of the HGL.
The rights granted to Lawnwood in sections 1 and 5 relating to hospital-based services are also a significant feature of the HGL. Under the Medical Staff Bylaws, the medical staff has an important role to play in reviewing and making recommendations "prior to any decision being made" relating to execution of an exclusive contract in a new department or service, renewing or modifying an existing exclusive contract in a particular department or service, and termination of any exclusive contract or service. Medical Staff Bylaws, art. VI, pt. C, § 4. Under these bylaws, even though the Board would have final authority on decisions relating to hospital-based contractual services, the role of the medical staff is a critical element in the decision-making process and the Board must have good cause to reject the recommendations of the medical staff in this area. Sections 1 and 5 of the HGL, however, grant the Board the right to circumvent the recommendation of the medical staff in the important area of hospital-based services by expressly providing that the Board's bylaws relating to hospital-based services will prevail over any conflicting provisions of the Medical Staff Bylaws. With this right residing in the Board, the role of the medical staff in granting, terminating, or renewing contracts for hospital-based services is marginalized, if not nullified.
Further, under the HGL, the medical staff's role in the area of staff membership has been all but eliminated. The Medical Staff Bylaws provide for a credentials committee consisting of members of the medical staff to review the credentials of new applicants for all categories of staff appointments and clinical privileges and to make recommendations to the Board. Medical Staff Bylaws, art. V, pt. C. The role played by the medical staff in the area of appointments to the medical staff is set forth in article VI, part A, of the bylaws and provides that persons who may admit patients or practice medicine in the hospital "shall be appointed to the medical staff after recommendation of the Medical Executive Committee and upon approval of the Board of Trustees." The bylaws further provide that "[r]atification of the medical staff decision or medical staff matters shall not be unreasonably withheld." Medical Staff Bylaws, art. XI, § 3. Yet the *517 right to override these recommendations, without any meaningful checks or balances, has been granted to the Board by the HGL.
Similarly, in the area of quality assurance, the Medical Staff Bylaws also provide for a quality assurance committee consisting only of medical staff members whose duties are to act upon recommendations from the MEC with respect to quality review, evaluation and monitoring. Medical Staff Bylaws, art. V, pt. E. In contrast, sections 1, 5 and 6 of the HGL shift power over quality assurance matters to the Board.
Moreover, in section 5 of the HGL as well as section 6, the entire process for peer review is altered to once again provide the Board, and ultimately the hospital, control over the peer review process. Section 6 requires the medical staff to act within 75 days after a request from the governing board regarding actions against an individual physician and also allows for the creation of a conference committee to second-guess the medical staff recommendations. Neither this 75-day time requirement nor the conference committee process is contained in the current bylaws or in the law of this State. Section 6 also provides the Board with the right to override the recommendation of the peer review panel or the medical staff's recommendations for staff membership, clinical privileges, or quality assurance without any uniformly applied reasonableness or good cause requirement, as was previously required by the Medical Staff Bylaws.
In sum, the previously existing Medical Staff Bylaws established a framework for cooperative governing in which the medical staff plays an important role in the recommendation of candidates for appointment and credentialing, peer review, and decisions on contract-based services. The framework for governing, and the medical staff's important role in it pursuant to the bylaws, is altered by the HGL in a manner favorable to the Board by the many rights conferred on the corporation, in which the HGL essentially gives the Board plenary power to take independent action in these areas. At a minimum, these multiple facets of the HGL grant Lawnwood a "right" and place it in an advantageous position, one that it did not possess before the law was enacted.[19]
Finally, although Lawnwood contends that the law was promulgated in response to a concern for patient safety, we note that the two physicians that it claims were a threat to the hospital and its patients were no longer on staff at the time of the enactment of the law.[20] Assuming that patient safety was the initial driving force, the provisions of the HGL extend far beyond actions relating to peer review and discipline and are not limited in time. Further, the provisions of the HGL extend to both private hospitals in St. Lucie County, even though the disputes regarding the staff physicians occurred in only one of the hospitals.
Because the HGL grants Lawnwood almost absolute power in running the affairs of the hospital, essentially without meaningful regard for the recommendations or *518 actions of the medical staff, we conclude that the HGL unquestionably grants Lawnwood "rights," "benefits" or "advantages" that fall within the definition of the term "privilege" as used in article III, section 11(a)(12). Therefore, we agree with the trial court and First District's findings that the HGL granted Lawnwood a privilege in contravention of article III, section 11(a)(12), by altering the balance of power that has existed since Lawnwood initially approved the Medical Staff Bylaws, clearly in Lawnwood's favor.

Severability
Although we have concluded that the HGL unconstitutionally confers a privilege on Lawnwood, we will address whether any of the law's invalid provisions can be severed, in light of our obligation "to uphold the constitutionality of legislative enactments where it is possible to strike only the unconstitutional portions." Ray v. Mortham, 742 So.2d 1276, 1280 (Fla.1999). Although Lawnwood conceded at oral argument that there might be some concern regarding the last sentence of section 5, which allows the Board to unilaterally amend the Medical Staff Bylaws, Lawnwood argues that this provision is severable. The judicial doctrine of severability is "derived from the respect of the judiciary for the separation of powers, and is `designed to show great deference to the legislative prerogative to enact laws.'" Id. (quoting Schmitt v. State, 590 So.2d 404, 415 (Fla.1991)).
We held in Cramp v. Board of Public Instruction, 137 So.2d 828 (Fla.1962), that a four-part test should be used to determine whether the invalid portions of an act can be severed:
When a part of a statute is declared unconstitutional the remainder of the act will be permitted to stand provided: (1) the unconstitutional provisions can be separated from the remaining valid provisions, (2) the legislative purpose expressed in the valid provisions can be accomplished independently of those which are void, (3) the good and the bad features are not so inseparable in substance that it can be said that the Legislature would have passed the one without the other and, (4) an act complete in itself remains after the invalid provisions are stricken.
Id. at 830. Neither the trial court nor the district court addressed the issue of severability. However, we conclude that the last sentence of section 5 is not the only portion of the law that grants a privilege to Lawnwood in violation of article III, section 11(a)(12). Rather, the statutory scheme set forth in the HGL is replete with special benefits and advantages granted to Lawnwood. Under the test set forth in Cramp, it cannot be said that the HGL would be an act complete in itself, once the invalid portions are severed, that would accomplish what the Legislature so clearly intended by the many different provisions granting the corporation privileges, as we discussed above.[21] Accordingly, we reject the contention that any of the unconstitutional provisions can be severed and the remainder preserved.

CONCLUSION
Based on the above analysis, we conclude that the HGL grants a privilege to a private corporation in contravention of the Florida Constitution and that the severance of any section will not mend this constitutional encroachment. Therefore, we affirm the final judgment of the First District Court of Appeal.
It is so ordered.
*519 QUINCE, C.J., and WELLS, LEWIS, and BELL, JJ., concur.
ANSTEAD, J., recused.
CANTERO, J., did not participate.
NOTES
[1] The American Medical Association, the Florida Medical Association and the Association of American Physicians and Surgeons submitted amicus briefs in support of the contention that the HGL unconstitutionally grants Appellant, Lawnwood Medical Center, Inc., a privilege.
[2] Lawnwood also contends that the HGL does not unconstitutionally impair the obligations of contracts, does not impermissibly amend a statute by implication in violation of article III, section 6, of the Florida Constitution, and does not violate equal protection guarantees of the Florida and federal constitutions. Because we answer this question based on article III, section 11(a)(12), of the Florida Constitution, we do not reach these remaining points.
[3] The Medical Executive Committee is composed of members of the medical staff. The committee's duties include making "recommendations to the Board on hospital management matters and other matters that may affect the quality of care" and "to review the Bylaws, rules and regulations of the medical staff as necessary and recommend such changes thereto as may be necessary or desirable." Medical Staff Bylaws, art. V, pt. B.
[4] Whether the HGL was validly enacted is not contested in the instant case. The parties do not address the issue and the trial court found in its Summary Final Judgment that the law was properly enacted, stating "[t]here is no dispute regarding whether the Hospital Governance Law meets the procedural requirements of a special law; it was properly noticed as a special law, and enacted as one."
[5] The Florida Attorney General was initially joined as a party, but declined to defend the statute's constitutionality and the trial court dismissed him as a party. The Attorney General was not a party to the First District proceeding, nor is he a party before this Court.
[6] The second hospital, St. Lucie Medical Center, also a corporately owned for-profit hospital, is not a party to this litigation.
[7] Judge Benton joined in only that portion of the opinion holding the law unconstitutional as granting a privilege to a private corporation. Lawnwood, 959 So.2d at 1225 (Benton, J., concurring specially).
[8] Article III, section 11, of the Florida Constitution states in full:

(a) There shall be no special law or general law of local application pertaining to:
(1) election, jurisdiction or duties of officers, except officers of municipalities, chartered counties, special districts or local governmental agencies;
(2) assessment or collection of taxes for state or county purposes, including extension of time therefor, relief of tax officers from due performance of their duties, and relief of their sureties from liability;
(3) rules of evidence in any court;
(4) punishment for crime;
(5) petit juries, including compensation of jurors, except establishment of jury commissions;
(6) change of civil or criminal venue;
(7) conditions precedent to bringing any civil or criminal proceedings, or limitations of time therefor;
(8) refund of money legally paid or remission of fines, penalties or forfeitures;
(9) creation, enforcement, extension or impairment of liens based on private contracts, or fixing of interest rates on private contracts;
(10) disposal of public property, including any interest therein, for private purposes;
(11) vacation of roads;
(12) private incorporation or grant of privilege to a private corporation;
(13) effectuation of invalid deeds, wills or other instruments, or change in the law of descent;
(14) change of name of any person;
(15) divorce;
(16) legitimation or adoption of persons;
(17) relief of minors from legal disabilities;
(18) transfer of any property interest of persons under legal disabilities or of estates of decedents;
(19) hunting or fresh water fishing;
(20) regulation of occupations which are regulated by a state agency; or
(21) any subject when prohibited by general law passed by a three-fifths vote of the membership of each house. Such law may be amended or repealed by like vote.
(b) In the enactment of general laws on other subjects, political subdivisions or other governmental entities may be classified only on a basis reasonably related to the subject of the law.
[9] Neither party has provided an example of a special law that has been passed affecting a private corporation since the 1968 constitutional prohibition.
[10] We refer to the definitions of the word "privilege" as they appeared in 1968, when the Florida Constitution was revised to add article III, section 11(a)(12). The definitions have not substantially changed from those that existed at the time of the 1968 constitutional revision. See Black's Law Dictionary 1234 (8th ed.2004) (defining "privilege" as "[a] special legal right, exemption, or immunity granted to a person or class of persons; an exception to a duty"); Merriam-Webster's Collegiate Dictionary 928 (11th ed.2005) (defining the word "privilege" as "a right or immunity granted as a peculiar benefit, advantage, or favor").
[11] Two states have constitutional provisions prohibiting the granting of "corporate powers or privileges." See Wash. Const., art. II, § 28; Wis. Const., art. IV, § 31. The grant of an "exclusive privilege" to a corporation is prohibited by the constitutions of two other states. See N.J. Const., art. IV, § 7, ¶ 9; N.Y. Const., art. III, § 17. Ten states have constitutional provisions prohibiting the grant of a "special or exclusive" privilege to a corporation. See Ariz. Const., art. IV, pt. 2, § 19; Colo. Const., art. V, § 25; La. Const., art. III, § 12(A)(7); Minn. Const., art. XII, § 1; Mo. Const., art. III, § 40(28); Neb. Const.; art. III, § 18; N.M. Const., art. IV, § 24; S.D. Const., art. III, § 23(9); Va. Const., art. IV, § 14, cl. 18; Wyo. Const., art. III, § 27.
[12] While not referencing "privilege," the 1885 Constitution prohibited a number of other special laws:

Section 20. The Legislature shall not pass special or local laws in any of the following enumerated cases: that is to say, regulating the jurisdiction and duties of any class of officers, except municipal officers, or for the punishment of crime or misdemeanor; regulating the practice of courts of justice, except municipal courts; providing for changing venue of civil and criminal cases; granting devorces [sic]; changing the names of persons; vacating roads; summoning and empanneling [sic] grand and petit juries, and providing for their compensation; for assessment and collection of taxes for State and county purposes; for opening and conducting elections for State and county officers, and for designating the places of voting; for the sale of real estate belonging to minors, estates of descendents, and of persons laboring under legal disabilities; regulating the fees of officers of the State and county; giving effect to informal or invalid deeds or wills; legitimizing children; providing for the adoption of children; relieving minors from legal disabilities; and for the establishment of ferries.
Art. III, § 20, Fla. Const. of 1885.
Section 21. In all cases enumerated in the preceding Section, all laws shall be general and of uniform operation throughout the State, but in all cases not enumerated or excepted in that Section, the Legislature may pass special or local laws, . . . Provided that no local or special bill shall be passed, nor shall any local or special law establishing or abolishing municipalities, or providing for their government, jurisdiction and powers, or altering or amending the same, be passed, unless notice of intention to apply therefor shall have been published in the manner provided by law where the matter or thing to be affected may be situated, which notice shall be published in the manner provided by law at least thirty days prior to introduction into the Legislature of any bill. . . .
Art. III, § 21, Fla. Const. of 1885 (1938).
[13] For example, provision 13 expanded the prohibition of special laws from "giving effect to informal or invalid deeds or wills" to now include the "effectuation of invalid deeds, wills or other instruments." Provision 18 expanded the prohibition of special laws on "sales of real estate belonging to minors" to now encompass "the transfer of any property interest of persons under legal disabilities or of estates of decedents." Moreover, provision 21 allows the Legislature to add to section 11's list of prohibited subjects by passing a general law approved by a three-fifths vote of the membership of each house.
[14] A review of the discussions of the 1968 Constitution Revision Commission supports this conclusion. Representative Frank Fee stated:

"[T]he general public is getting an idea that the legislator wants to hold his little individual power over local legislation for his own personal benefit."
Convention of the Fla. Constitution Revision Comm'n, transcript of proceedings at 37-38 (Dec. 9, 1966) (available at Fla. Supreme Court Library, Tallahassee, FL). Judge Hugh M. Taylor, another member of the Revision Commission, stated:
Where the State Road Department or the Forestry Department, or some other state agency, has land in a certain county, it is a state asset and should be handled as a state asset, rather than disposed of according to local law by some local situation, meet some local situation that might not be to the interest of the state as a whole.
Id. at 60. Finally, Chairman Chesterfield H. Smith stated:
All of these things that they are worried about can be handled by general bill. Local bills are no panacea and if you had to pass general bills and got in the habit of it, we would have a lot more stability in the state, we would have a lot better government and people would face up to issues that they should face up to in general legislation.
We need to get local legislation in general out of the halls of the Legislature and let the legislators consider problems of statewide importance.
Id. at 92.
[15] Section 2 (popular name of the law), section 3 (directive to establish a governing board), section 4 (statement of governing board responsibilities and statutory authority), and section 7 (effective date) are not pertinent to our discussion.
[16] Section 1 of the HGL states:

Section 1. This act clarifies the delineation of authority within each hospital within St. Lucie County. It is the intent of the Legislature to provide consolidation of a hospital corporation's board of directors' power, authority, duty, and ultimate responsibility under existing statutes with respect to the operation of a hospital, including, but not limited to, the granting, denial, and discipline of medical staff and clinical privileges, and for compliance with statutorily mandated peer review, risk management, and quality assurance activities. This act is not intended to supersede, amend, or terminate any existing medical staff bylaws, but rather to clarify that in the event of a conflict between bylaws of a hospital corporation's board of directors and a hospital's medical staff bylaws, the hospital board's bylaws shall prevail with respect to medical staff privileges, quality assurance, peer review, and contracts for hospital-based services.
[17] Section 5 of the HGL provides:

Section 5. A governing board's authority for the administration of the hospital is not limited by the authority of its medical staff. Therefore, a governing board may reject or modify a medical staff recommendation or may, if the medical staff has failed to act, take action independent of the medical staff concerning medical staff membership, clinical privileges, peer review, and quality assurance in accordance with the procedures specified in section 6. To the extent, if any, that the bylaws or other regulations of the medical staff conflict with the bylaws or other regulations of the governing board, the bylaws or other regulations of the governing board shall control with respect to medical staff privileges, quality assurance, peer review, and contracts for hospital-based services, irrespective of the identity of the drafter of the respective bylaws or regulations. However, in no event shall a decision regarding medical staff privileges be made by the governing board entirely upon economic considerations. Neither the governing board nor a hospital's medical staff shall unilaterally amend a hospital's medical staff bylaws and related manuals, rules, or regulations. Any amendments or revisions proposed by the governing board shall first be submitted to the medical staff for its recommendations, including 30 days' notice for response, and any response timely made shall be carefully considered by the governing board prior to its approval of the proposed amendments or revisions.
[18] Section 6 of the HGL states in full:

Section 6. To the extent a governing board seeks to modify a medical staff recommendation, or where a medical staff has failed to act within 75 days after a request from the governing board to take action against, or with regard to, an individual physician concerning medical staff membership, clinical privileges, peer review, or quality assurance, a governing board may take action independent of the actions of the medical staff. Any such action shall be subject to a fair hearing process, if authorized by the medical staff bylaws, in which the physician is entitled to be represented by counsel, to be afforded an opportunity to present oral and written argument in response to the corrective or disciplinary action proposed, and to comment upon and cross-examine witnesses and evidence against such physician. If, after any fair hearing, the governing board determines that corrective or disciplinary action is necessary, it shall recommend such action to a six-member joint conference committee composed of three members of the governing board, to be appointed by the chair of the governing board, and three members of the medical staff, to be appointed by the chair or president of the medical staff. The joint conference committee shall, within 15 days after the governing board's decision after the fair hearing process, review the fair hearing recommendation and notify the governing board that the joint conference committee accepts, rejects, or cannot reach a majority consensus concerning the governing board's recommendation. If the joint conference committee's recommendation is to accept the governing board's recommendation, the governing board's decision shall be final. If the joint conference committee rejects the governing board's recommendation and suggests an alternative corrective or disciplinary action, or finds that no corrective or disciplinary action is warranted, the governing board shall not unreasonably reject the joint conference committee's recommendation. If the joint conference committee cannot reach a majority consensus to either accept or reject the governing board's action concerning the fair hearing decision, the governing board's action shall be final. The governing board shall give full and complete consideration to the joint conference committee's recommendations.
[19] Although the HGL did not limit its application to the two private hospitals that existed in St. Lucie County in 2003, we look only to private hospitals in existence at the time the law was passed and do not consider the law's effect on hospitals that may open in St. Lucie County in the future in our determination of whether a privilege was provided to "a private corporation."
[20] Seeger contends and Lawnwood does not dispute that Dr. Walker and Dr. Minarcik were no longer on staff at Lawnwood at the time the law was enacted.
[21] The HGL does not contain a severability clause.