# Supreme Court of Florida

_____

No. SC17-1993
_____

**LEE MEMORIAL HEALTH SYSTEM,**
Appellant,

vs.

**PROGRESSIVE SELECT INSURANCE COMPANY,**
Appellee.

December 20, 2018
**<u>CORRECTED OPINION</u>**

LAWSON, J.

This case is before the Court on appeal from a decision of the Second

District Court of Appeal, *Lee Memorial Health System v. Progressive Select*

*Insurance Co.*, 230 So. 3d 558 (Fla. 2d DCA 2017), which held chapter 2000-439,

section 18, Laws of Florida, ("the LMHS Lien Law") invalid under the Florida

Constitution. This Court has jurisdiction of the appeal under article V, section

3(b)(1) of the Florida Constitution.

The Second District held that the LMHS Lien Law violates article I, section

10 and article III, section 11(a)(9) of the Florida Constitution. For the reasons

explained below, we agree with the Second District as to the violation of article III,

section 11(a)(9) and therefore approve of and affirm that part of the opinion.

However, we disagree with the Second District's decision to reach the question of whether the LMHS Lien Law violates article I, section 10, as well as an additional issue pertaining to the damages available under the statute. Accordingly, we reverse those portions of the Second District's opinion.

## FACTS AND PROCEDURAL HISTORY

Lee Memorial Health System is a "public health care system in Lee County" created by chapter 2000-439, Laws of Florida, and is the beneficiary of certain rights against private citizens and companies under the LMHS Lien Law. *Lee Mem'l Health Sys. v. Progressive Select Ins. Co.*, 230 So. 3d 558, 559 (Fla. 2d DCA 2017). Specifically, the LMHS Lien Law entitles Lee Memorial to liens for its charges for healthcare services, defines what actions constitute impairment of those liens, and creates a cause of action to recover damages for impairment of those liens by others—including persons, firms, or corporations who are neither the providers nor the beneficiaries of the healthcare services at issue. To these ends, the LMHS Lien Law provides as follows:

> Lee Memorial Health System shall be entitled to a lien for all reasonable charges for hospital, physician, or other health care services provided by the Lee Memorial Health System to ill or injured persons, upon the proceeds of all causes of action, suits, claims, counterclaims, and demands accruing to said persons or to their legal representatives, and upon all judgments, settlements, and settlement agreements rendered or entered into by virtue thereof, on account of injuries giving rise to such causes of action, suits, claims,

counterclaims, demands, judgments, settlements, or settlement agreements, which injuries shall have necessitated such hospital, physician, and other services provided to such ill or injured persons. . . .

. . . .

. . . No release or satisfaction of any cause of action, suit, claim, counterclaim, demand, judgment, settlement, or settlement agreement shall be valid or effectual as against the lien of Lee Memorial Health System unless the lienholder shall join therein or execute a release of its lien prior to the payment of any proceeds thereof.  Any acceptance of a release or satisfaction of any cause of action, suit, claim, counterclaim, demand, judgment, settlement, or settlement agreement in the absence of a release or satisfaction of the lien of Lee Memorial Health System shall prima facie constitute an impairment of such lien and the lienholder shall be entitled to a cause of action for damages against any and all persons, firms, or corporations giving or accepting such release or satisfaction, or paying or accepting the proceeds from the same.  In such action, Lee Memorial Health System may recover the full amount of its charges for such hospital, physician, or other health care services; regardless of the amount of proceeds paid or received in impairment of its lien.

Ch. 2000-439, § 18, Laws of Fla.

The constitutional challenge to this law arose out of a lawsuit filed by Lee Memorial against Progressive Select Insurance Company for the impairment of two liens Lee Memorial had filed based on the provision of medical treatment to an injured person. *Lee Memorial Health Sys.*, 230 So. 3d at 559-60.  Lee Memorial alleged that Progressive impaired these liens by settling a claim with the injured person on behalf of Progressive's insured without the knowledge or consent of Lee Memorial and without the satisfaction or release of Lee Memorial's liens. *Id*. at 560.

In the trial court, Progressive moved for summary judgment, raising three arguments relevant to our review. First, Progressive argued that the LMHS Lien Law is "unconstitutional as a special law pertaining to the creation, enforcement, extension and/or impairment of liens based on private contracts in violation of Article III, § 11(a)(9), of the Florida Constitution." *Id.* Second, Progressive argued that chapter 2000-439 "is an unconstitutional impairment of the insurance contract between Progressive and its insured . . . under Article I, § 10 of the Florida Constitution." *Id.* Third, Progressive argued in the alternative that, if Lee Memorial is entitled to any recovery for the impairment of its lien, that recovery must be limited to the amount of the settlement proceeds and/or the limits of the insurance policy, rather than for the amount of the entire hospital lien. The trial court entered final summary judgment for Progressive, declaring the LMHS Lien Law unconstitutional under article III, section (11)(a)(9). The trial court's order was silent as to the remaining issues.

Lee Memorial appealed the trial court's decision to the Second District, arguing error as to the issue decided. Progressive responded to this argument and further requested that the Second District address the damages issue in the event it found the LMHS Lien Law constitutional. The Second District affirmed the trial court, not only because it determined that the LMHS Lien Law violates article III, section 11(a)(9), but also because it determined that the LMHS Lien Law violates

- 4 -

the constitutional prohibition against the impairment of contracts under article I, section 10. *Lee Mem'l Health Sys.*, 230 So. 3d at 560-64. The Second District also addressed the damages issue, viewing Progressive's arguments concerning that provision of the LMHS Lien Law as part of the contract-impairment issue. *See id.* at 564. Accordingly, the Second District declared the LMHS Lien Law unconstitutional under article I, section 10, and article III, section (11)(a)(9). *Id.* Lee Memorial appealed the Second District's decision to this Court pursuant to our mandatory jurisdiction to review decisions of district courts that declare state statutes invalid.

**ANALYSIS**

Lee Memorial argues that the Second District erred in addressing the contract-impairment issue because that issue was not raised to the Second District and the Attorney General was not served with proper notice as to that issue under Florida Rule of Civil Procedure 1.071. Lee Memorial further argues that the Second District erred on the merits as to both constitutional rulings. We agree with Lee Memorial that the Second District should not have addressed the contract-impairment issue. Progressive did not serve proper notice on the Attorney General, and the trial court's decision not to rule on that issue was therefore proper. Accordingly, we reverse the portion of the Second District's decision declaring the LMHS Lien Law a violation of article I, section 10 and do not

address the merits of this claim. However, we disagree with Lee Memorial as to the violation of article III, section 11(a)(9). We agree with the trial court and the Second District that the LMHS Lien Law violates article III, section 11(a)(9) as a special law pertaining to the "creation, enforcement, extension or impairment of liens based on private contracts." This holding renders Progressive's arguments concerning the statutory damages moot. We explain our determinations as to the Second District's error in addressing the contract-impairment issue and the Second District's correct holding as to the article III, section 11(a)(9) below.[1]

### A. Notice Requirement of Rule 1.071

Rule 1.071 provides the following requirements for challenging the constitutionality of a law:

> A party that files a pleading, written motion, or other document drawing into question the constitutionality of a state statute or a county or municipal charter, ordinance, or franchise must promptly
> **(a)** file a notice of constitutional question stating the question and identifying the document that raises it; and
> **(b)** serve the notice and the pleading, written motion, or other document drawing into question the constitutionality of a state statute or a county or municipal charter, ordinance, or franchise on the Attorney General or the state attorney of the judicial circuit in which the action is pending, by either certified or registered mail.

Fla. R. Civ. P. 1.071.

---

1. Amici curiae for Progressive raise additional issues. However, we decline to address those issues because "it is well-settled that amici are not permitted to raise new issues." *League of Women Voters of Florida v. Detzner*, 172 So. 3d 363, 373 n.5 (Fla. 2015).

In this case, Progressive filed a "notice of constitutional question" and served it on the proper parties before the summary judgment hearing. However, this notice indicated only that the statute was being challenged under article III, section 11(a)(9), not that it was also being challenged under article I, section 10. After receiving full arguments from the parties on the merits of both constitutional issues at the summary judgment hearing, the trial court orally ruled that the article I, section 10 issue was not ripe for decision because Progressive had not served notice on the Attorney General or the State Attorney as to that issue. The trial court also announced its decision as to article III, section 11(a)(9) and directed Progressive's counsel to prepare an order consistent with its rulings. After the hearing, Progressive filed and served a new notice on the Attorney General and the State Attorney. Nevertheless, the trial court's order granting Progressive's motion for summary judgment is silent as to the contract-impairment issue.

Failure to comply with rule 1.071 bars consideration of a claim that would result in the striking of a state statute as unconstitutional. *Shelton v. Bank of New York Mellon*, 203 So. 3d 1003, 1005 (Fla. 2d DCA 2016) (citing *Diaz v. Lopez*, 167 So. 3d 455, 460 n.10 (Fla. 3d DCA 2015)). It is undisputed that Progressive failed initially to comply with rule 1.071. Progressive argues that it cured this non-compliance by serving notice on the Attorney General and the State Attorney concerning the contract-impairment issue after the summary judgment hearing,

- 7 -

making the issue an appropriate consideration for the Second District. We disagree. By the time Progressive attempted to cure the defect in its notice, the trial court had already announced its decision not to address the issue and given directions for the preparation of an order disposing of the motion for summary judgment and, ultimately, the case. Progressive's notice was therefore not prompt as required by rule 1.071 and did not provide the State a sufficient opportunity to participate in the trial court proceedings. The trial court was not required to conduct further proceedings and possibly delay the case pending a decision by the State as to whether to participate. For these reasons, the Second District should not have disregarded the trial court's appropriate determination that the contract-impairment issue was not properly before the court and decided an issue that was not addressed in the parties' briefs. Accordingly, we reverse that portion of the Second District's opinion and decline to address the merits of the contract-impairment issue.

## B. Article III, section 11(a)(9)

The constitutional provision that controls the outcome of this proceeding is article III, section 11(a)(9), which provides in pertinent part as follows:

> There shall be no special law or general law of local application pertaining to . . . creation, enforcement, extension or impairment of liens based on private contracts . . . .

It is undisputed that the LMHS Lien Law is a "special law . . . pertaining to . . . creation, enforcement, extension or impairment of liens." Art. III, § 11(a)(9), Fla. Const. The question presented for our decision is whether those liens are "based on private contracts." We conclude that they are, as illustrated by the facts of this case, involving a lien based on a contract for the receipt of and payment for medical treatment between Lee Memorial and a patient. We therefore conclude that the LMHS Lien Law is unconstitutional.

Both the constitutionality of a statute and its meaning are issues of law that this Court reviews de novo. *Shands Teaching Hosp. & Clinics, Inc. v. Mercury Ins. Co.*, 97 So. 3d 204, 209 (Fla. 2012).

The determination of the meaning of a constitutional provision begins with its plain language. *Lawnwood Med. Ctr., Inc. v. Seeger*, 990 So. 2d 503, 510-11 (Fla. 2008). "If that language is clear, unambiguous, and addresses the matter in issue, then it must be enforced as written." *Id*. at 511 (quoting *Fla. Soc'y of Ophthalmology v. Fla. Optometric Ass'n*, 489 So. 2d 1118, 1119 (Fla. 1986)). If the language is ambiguous, this Court "must endeavor to construe the constitutional provision in a manner consistent with the intent of the framers and the voters." *Ford v. Browning*, 992 So. 2d 132, 136 (Fla. 2008).

Widely circulated dictionaries are helpful for identifying the plain meaning of constitutional language. *Lawnwood*, 990 So. 2d at 511; *Myers v. Hawkins*, 362

So. 2d 926, 930 (Fla. 1978) (noting that the Court "initially consult[ed] widely circulated dictionaries, to see if there exists some plain, obvious, and ordinary meaning for the words or phrases approved for placement in the [c]onstitution"). Legal dictionaries can also be helpful. *Lawnwood*, 990 So. 2d at 511. However, because the constitution is "an instrument from the people," widely circulated dictionaries can be even more indicative of the constitution's meaning than legal dictionaries are. *See id.* at 512 ("[U]nless the text of a constitution suggests that a technical meaning is intended, words used in the constitution should be given their usual and ordinary meaning because such is the meaning most likely intended by the people who adopted the constitution."). For the same reason, this Court takes into account the "common sense understanding" of words used in the constitution. *See Lawnwood*, 990 So. 2d at 512.

Webster's Dictionary contains a multitude of definitions for "private" and "public." The most pertinent definitions, based on the usage examples provided, indicate that "private" has the following meanings: (1) "intended for or restricted to the use of a particular person or group or class of persons: not freely available to the public," as in a private party; (2) "affecting the interests of a particular person, class or group of persons, or locality: not general in effect," as in a private act; and (3) "not known in public or carried on in public: not open," as in private negotiations or a private understanding. Private, *Webster's Third New*

*International Dictionary* 1804-05 (unabr. 1981). Similarly, *Black's Law Dictionary* defines "private" as "[a]ffecting or belonging to private individuals, as distinct from the public generally." Private, *Black's Law Dictionary* 1358 (4th ed. 1968).

The most pertinent definitions of "public" include the following: (1) "of, relating to, or affecting the people as an organized community," as in a public holiday; (2) "authorized or administered by or acting for the people as a political entity," as in public expenditures; (3) "provided for, used by, or containing the records of a government agency," as in public documents; (4) "accessible to or shared by all members of the community," as in a public hearing; (5) "supported by or for the benefit of the people as a whole," as in public education or public welfare agencies; and (6) "providing services to the people on a business basis under some degree of civic or state control," as in the work of public agents on a railroad. Public, *Webster's Third New International Dictionary* 1836 (unabr. 1981). *Black's Law Dictionary* defines "public" as follows:

> Pertaining to a state, nation, or whole community; proceeding from, relating to, or affecting the whole body of people or an entire community. Open to all; notorious. Common to all or many; general; open to common use. Belonging to the people at large; relating to or affecting the whole people of a state, nation, or community; not limited or restricted to any particular class of the community.

Public, *Black's Law Dictionary* 1393 (4th ed. 1968) (citations omitted).[2]

Lee Memorial contends that the contract must be public because Lee Memorial is a public entity. However, the term "private" in this constitutional provision modifies the contract, not the parties who have entered the contract. The subject matter of the contract is the provision of and payment for medical services, not the administrative operation of Lee Memorial.

The available definitions of "private" and "public" that are most reasonably applied to a contract, along with common sense, show that the contract at issue is private. The provision of medical services to the patient in this case and his agreement to pay for those services upon entry to the hospital are matters that are generally "intended for or restricted to the use of a particular person" and "not freely available to the public." Private, *Webster's Third New International Dictionary* 1804-05 (unabr. 1981). Like private negotiations, the performance of this contract was "not known in public or carried on in public." *Id.*[3] Moreover, as

---

2. The 1968 version of *Black's Law Dictionary* is cited because that version is contemporaneous with the adoption of article III, section 11(a)(9), and, accordingly, is the most reflective of the meaning of the words used therein. *See Lawnwood*, 990 So. 2d at 511 n.10.

3. Lee Memorial contends that the contract is public because it is evidenced by a form admissions agreement that every patient of the hospital is required to sign and that is available, at least in a redacted form, as a public record. We need not decide the extent to which the signed form would be available as a public record and conclude that, even if it is fully available to the public, that availability

in *Mercury Insurance Co. of Florida v. Shands Teaching Hospital & Clinics, Inc.*, 21 So. 3d 38, 39 (Fla. 1st DCA 2009), *quashed on other grounds*, 97 So. 3d 204 (Fla. 2012), where a similar law was found unconstitutional, the assets to which the liens attached were not "the public's assets, but rather . . . the assets of the patient." In other words, the contract itself was to be funded by private assets. Thus, the contract at issue is a private contract.

Our conclusion that the contract at issue is private due to the subject matter, rather than the nature of one of the parties, as Lee Memorial would have us decide, is also consistent with the way in which the term "private contract" has been used in case law. *See Ass'n. for Retarded Citizens, Dade County v. State, Dep't of Health & Rehabilitative Servs.*, 619 So. 2d 452, 454 (Fla. 3d DCA 1993) (referring to a settlement agreement between a private citizen and a state agency concerning a lawsuit by the citizen against the agency as "private"); *Palm Beach County Classroom Teacher's Ass'n v. Sch. Bd. of Palm Beach County*, 411 So. 2d 1375, 1376 (Fla. 4th DCA 1982) (stating that "the provisions of a private agreement entered into by public bodies," referring to a teachers' union and a school board, "cannot be used to circumvent the requirements" of the Government in the Sunshine Act); *Mills v. Doyle*, 407 So. 2d 348, 350-51 (Fla. 4th DCA 1981)

---

does not dictate the nature of the contract. It is the subject matter, the provision of and payment for healthcare services, that does.

(holding that the same "private" contract at issue in *Palm Beach County Classroom Teacher's Association* could not create exemptions from the public records law); *J.C. Vereen & Sons, Inc. v. City of Miami*, 397 So. 2d 979, 983 (Fla. 3d DCA 1981) (recognizing a contract between a municipality and a landowner as a "private contract"). Although these references are made in passing, as Lee Memorial argues, rather than in an effort to define "private contract," they do reveal an implicit (and common) understanding by appellate courts in this state that public entities can enter into private contracts, which bears on the meaning of this term as used in this state's foundational governing document.

Our conclusion that the nature of a contract as public or private is not defined by the identity of a single party, but by the nature of the subject matter, is further supported by examples of case law identifying contracts as "public contracts" in cases involving competitive bidding for public works projects. *See, e.g.*, *Miami-Dade County Sch. Bd. v. J. Ruiz Sch. Bus Serv., Inc.*, 874 So. 2d 59, 61 (Fla. 3d DCA 2004) ("Florida's competitive bid statutes were enacted for the benefit and protection of the public in that they are intended to ensure that the public receives the lowest and best price for goods and services and that public contracts are not awarded in an arbitrary and capricious manner."); *State v. Dinsmore*, 308 So. 2d 32, 37 (Fla. 1975) (acknowledging, in a case concerning a criminal charge against a public official for unlawful interest in a public contract,

that a "public contract" involves a "public work").  We agree with the Second

District's observations in this case concerning the concept of a "public contract,"

as opposed to a private one:

> [T]he concept of a "public contract" seems to exist solely within the
> framework of government procurement and almost always has to do
> with procurement of materials, supplies, and services.  *See, e.g.*,
> Public Contracts, 41 U.S.C. §§ 3101–4712 (2011) (establishing
> federal procurement policy and contracting procedure); *Miami–Dade
> Cty. Sch. Bd. . . .*, 874 So. 2d [at] 61 . . . ; *Intercontinental Props., Inc.
> v. Dep't of Health & Rehab. Servs.*, 606 So. 2d 380, 385-86 (Fla. 3d
> DCA 1992) (discussing public policy considerations pertaining to
> public contracts); *Satellite Television Eng'g, Inc. v. Dep't of Gen.
> Servs.*, 522 So. 2d 440 (Fla. 1st DCA 1988) (discussing the
> competitive bidding process for public contracts).  In short, to the
> extent that the term "public contract" has been defined, that definition
> appears to be a contract between a government entity and a private
> party to perform a task (such as construction) or for the provision of
> equipment, goods, or services that is financed by public funds.

*Lee Mem'l Health Sys.*, 230 So. 3d at 562-63.  Indeed, one writer has observed that

"[t]he vast body of literature on 'public contracts' tends to support" the view that

"what distinguishes a public contract from a private one is whether the contract

involves a public service or project," noting that "[s]uch contracts are extensively

regulated and publicly scrutinized."  Meta Calder, *Florida's Hospital Lien Laws*,

21 Fla. ST. U. L. Rev. 341, 361 (1993).  She concludes that, "If this . . . definition

is correct, then contracts that form the basis for hospital liens are private."  *Id*. at

361-62.  We find this definition correct, based on our review of the plain language

of the constitution, which is supported by examples of the manner in which that

- 15 -

language has been used in case law.  Thus, the LMHS Lien Law violates article III, section 11(a)(9) of the Florida Constitution.

## CONCLUSION

For the reasons explained above, we affirm the Second District's ruling that the LMHS Lien Law is unconstitutional under article III, section 11(a)(9) of the Florida Constitution.  We disapprove of the Second District's decision to reach the issues concerning contract impairment under article I, section 10 and find a discussion of the statutory damages unnecessary in light of our determination that the LMHS Lien Law cannot be enforced due to its violation of article III, section 11(a)(9).  Accordingly, we affirm the result of Second District's decision but reverse the portion of the Second District's decision reaching the issues concerning contract impairment and the damages provision of the LMHS Lien Law.

It is so ordered.

CANADY, C.J., and PARIENTE, QUINCE, POLSTON, and LABARGA, JJ.,
concur.
LEWIS, J., concurs in result only.

ANY MOTION FOR REHEARING OR CLARIFICATION MUST BE FILED
ON OR BEFORE DECEMBER 27, 2018.  A RESPONSE TO THE MOTION
FOR REHEARING/CLARIFICATION MAY BE FILED ON OR BEFORE
JANUARY 2, 2019.  NOT FINAL UNTIL THIS TIME PERIOD EXPIRES TO
FILE A REHEARING/CLARIFICATION MOTION AND, IF FILED,
DETERMINED.

- 16 -

An Appeal from the District Court of Appeal – Statutory or Constitutional Invalidity

Second District - Case No. 2D14-5925

    (Lee County)

Hala Sandridge of Buchanan Ingersoll & Rooney PC, Tampa, Florida,

    for Appellant

Valerie A. Dondero of Kubicki Draper, P.A., Miami, Florida,

    for Appellee

David A. Wallace of Bentley & Bruning, P.A., Sarasota, Florida,

    for Amicus Curiae Safety Net Hospital Alliance of Florida

Angela C. Flowers and Bretton C. Albrecht of Kubicki Draper, P.A., Ocala, Florida,

    for Amicus Curiae Geico General Insurance Company

John P. Joy and Sara M. Sandler of Walton Lantaff Schroeder & Carson LLP, Fort Lauderdale, Florida,

    for Amicus Curiae Allstate Insurance Company