# Supreme Court of Florida

_____

No. SC14-1899
_____

**JENNIFER BRINKMANN,**
Appellant,

vs.

**TYRON FRANCOIS, etc., et al.,**
Appellees.

[February 4, 2016]

PERRY, J.

This case is before the Court on appeal from a decision of the Fourth District Court of Appeal, Francois v. Brinkmann, 147 So. 3d 613, 614 (Fla. 4th DCA 2014), which declares invalid section 99.0615, Florida Statutes (2014), governing the residency requirement for write-in candidates of elections statewide. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons discussed below, we affirm the district court's decision.

## STATEMENT OF THE CASE & FACTS

The Fourth District set forth the relevant facts and procedural history of this case as follows:

Five candidates for Broward County Commissioner for District 2, all Democrats, qualified to have their names printed on the ballot for the August 2014 primary election. No Republican or Independent candidates filed qualifying papers. [Tyron] Francois, a sixth candidate and also a Democrat, filed qualifying paperwork to run as a write-in candidate. As a duly qualified write-in candidate, a blank space on the ballot for the November 2014 general election would have been provided to allow voters to write in Francois's name as their vote for the county commissioner to serve District 2. Francois's status as a qualified write-in candidate would constitute "opposition," as that term has been interpreted in relation to the Universal Primary Amendment (UPA), Article VI, section 5(b) of the Florida Constitution, thus requiring that the primary election be closed. See Telli v. Snipes, 98 So. 3d 1284 (Fla. 4th DCA 2012).

Appellee [Jennifer] Brinkmann, a resident voter, filed a complaint in the circuit court, alleging that Francois was not properly qualified to be a write-in candidate because he did not physically live within the boundaries of the district as required by section 99.0615, Florida Statutes (2014). Brinkmann also sought an order forcing the primary election to be opened to all voters pursuant to the UPA. Francois conceded below, as he does on appeal, that he did not live in the district at the time he filed papers to qualify as a write-in candidate. However, he contends that section 99.0615 is facially unconstitutional because it conflicts with the Florida Constitution and violates equal protection. After an evidentiary hearing, the circuit court found that section 99.0615 is constitutional and disqualified Francois as a write-in candidate. The circuit court also entered an injunction that opened the primary election to all registered voters.

Francois, 147 So. 3d at 614 (footnotes omitted).

The Fourth District reversed the circuit court's order, concluding that "section 99.0615, Florida Statutes (2014), is facially unconstitutional because the timing of its residency requirement for write-in candidates conflicts with the timing of the residency requirement for county commission candidates as established by Article VIII, section 1(e) of the Florida Constitution." Id. at 616. In support of its

holding, the district court cited State v. Grassi, 532 So. 2d 1055, 1056 (Fla. 1988),

in which this "[C]ourt construed the constitutional provision [in article VIII,

section 1(e), Florida Constitution,] regarding the residency requirement for county

commissioners and stated that [t]he Florida Constitution requires residency at the

time of election." Id. at 615 (internal quotation marks omitted). Given this

interpretation, the Fourth District found itself "convinced beyond a reasonable

doubt that the act contravenes the superior law." Id. at 616 (quoting Mairs v.

Peters, 52 So. 2d 793, 795 (Fla. 1951)) (internal quotation marks omitted). This

appeal follows.[1]

## ANALYSIS

Brinkmann raises three distinct issues in this case. Her first contention is

that the circuit court should not have been required to address Francois' facial

challenge as to the constitutionality of section 99.0615, Florida Statutes (2014),

because he did not provide the State with proper notice regarding the challenge.

Next, Brinkmann argues that, nevertheless, section 99.0615, governing the

residency qualification of write-in candidates for public office, does not contravene

_____

1. In Matthews v. Steinberg, 153 So. 3d 295, 298 (Fla. 1st DCA 2014), the First District Court of Appeal also overturned a circuit court ruling and held that the residency requirement of section 99.0615 directly contravenes the constitutional requirement that legislators reside within the subject district at the time of election. Matthews is currently on appeal before this Court, No. SC14-2202, and has been stayed pending disposition of the instant case.

the residency requirement applicable to county commissioners under article VIII, section 1(e), Florida Constitution. As such, because Francois failed to satisfy the statutory residency requirement, he did not qualify to run as a write-in candidate in the general election for the county commissioner's office. Finally, Brinkmann alternatively argues that even if section 99.0615 contravenes article VIII, section 1(e), and thus Francois properly qualified as a write-in candidate, such candidates are not included within the intended meaning of "opposition" as used in a different constitutional provision, namely, article VI, section 5, Florida Constitution. Therefore, the Democratic Party's primary election should have been opened to all registered voters. We will discuss each issue in turn.

## Preservation of Constitutionality Claim

Brinkmann contends that the issue regarding the constitutionality of section 99.0615, Florida Statutes, was not properly preserved because Francois failed to provide all appropriate parties with a meaningful opportunity to defend the challenge under Florida Rule of Civil Procedure 1.071. The record before us reflects that all procedural requirements were indeed satisfied, including proper notice being furnished to the Office of the State Attorney for the Seventeenth Judicial Circuit in and for Broward County. Therefore, the State was afforded a meaningful opportunity to intervene and be heard. That it did not actually participate in litigation does not preclude us, nor did it preclude the lower courts,

from considering Francois' claim. See Martin Mem'l Med. Ctr., Inc. v. Tenet Healthsystem Hosp., Inc., 875 So. 2d 797, 800 (Fla. 1st DCA 2004) ("[I]t seems to us relatively clear that, once the Attorney General or appropriate state attorney has been served, he or she may choose either to appear or not. However, in the latter event, non-participation has no effect on the litigation."). Accordingly, this argument is without merit.

## Constitutionality of Section 99.0615

The crux of this issue is whether section 99.0615, Florida Statutes, contravenes the relevant provision of article VIII, section 1(e), Florida Constitution, and by extension, whether Francois properly qualified as a write-in candidate for the 2014 Broward County Commissioner, District 2, general election. Because these issues turn on the determination of a statute's constitutionality and the interpretation of a provision of this state's constitution, they are pure questions of law and thus subject to de novo review. See Graham v. Haridopolos, 108 So. 3d 597, 603 (Fla. 2013) (quoting Crist v. Fla. Ass'n of Criminal Def. Lawyers, Inc., 978 So. 2d 134, 139 (Fla. 2008)). We recognize that because "statutes come clothed with a presumption of constitutionality[,] [they] must be construed whenever possible to effect a constitutional outcome." Id. "To overcome the presumption, the invalidity must appear beyond reasonable doubt, for it must be assumed the [L]egislature intended to enact a valid law." License Acquisitions,

LLC v. Debary Real Estate Holdings, LLC, 155 So. 3d 1137, 1143 (Fla. 2014) (quoting Lewis v. Leon Cnty., 73 So. 3d 151, 153 (Fla. 2011)) (internal quotation marks omitted).

This Court has long-instructed that statutes may not impose qualification requirements for public office over and above those set forth in the Florida Constitution. See Grassi, 532 So. 2d at 1056 (quoting State ex rel. Askew v. Thomas, 293 So. 2d 40, 42 (Fla. 1974) ("We have consistently held that statutes imposing additional qualifications for office are unconstitutional where the basic document of the constitution itself has already undertaken to set forth those requirements.")); Wilson v. Newell, 223 So. 2d 734, 735-36 (Fla. 1969) ("Section 99.032, Florida Statutes, is unconstitutional, invalid and ineffective because it prescribes qualifications for the office of County Commissioner in addition to those prescribed by the Constitution."). See also Levey v. Dijols, 990 So. 2d 688, 692 (Fla. 4th DCA 2008) ("Any statute that restricts eligibility beyond the requirements of the Florida Constitution is invalid." (citing Miller v. Mendez, 804 So. 2d 1243, 1246 (Fla. 2001))). As such, if any provision of the Florida Constitution provides qualifications for an office of county commissioner, then the Legislature is prohibited from imposing additional qualifications. Brinkmann argues that section 99.0615 does not alter the constitutional eligibility requirements

for an office of county commissioner, but instead regulates the procedures for being placed on an election ballot. We disagree.

The Florida Constitution sets forth residency requirements for various public officers. See, e.g., art. V, §§ 8, 17, 18, Fla. Const. (imposing residency requirements for the offices of justice or judge of any court, state attorney, and public defender); see also Abdool v. Bondi, 141 So. 3d 529, 550 (Fla. 2014) ("[W]hile the Legislature may statutorily modify the qualifications of registry counsel, CCRC, and RCC by statute, it may not alter the constitutionally enumerated qualifications or disqualifications of the public defender." (citing Crist, 978 So. 2d at 142)); Miller, 804 So. 2d at 1247 (rejecting claim that candidate for the office of circuit judge was unqualified because she did not reside in office's territorial jurisdiction when she filed her oath of candidate; held: constitution only requires that a candidate for judicial office reside within jurisdiction on the date he or she assumes office). With regard to an office of county commissioner, the Constitution reads:

> COMMISSIONERS. Except when otherwise provided by county charter, the governing body of each county shall be a board of county commissioners composed of five or seven members serving staggered terms of four years. After each decennial census the board of county commissioners shall divide the county into districts of contiguous territory as nearly equal in population as practicable. One commissioner residing in each district shall be elected as provided by law.

Art. VIII, § 1(e), Fla. Const. (emphasis added).  Our interpretation of the underscored provision has been clear.

In Grassi, we reviewed the district court's decision affirming the dismissal of misdemeanor charges brought against a county commissioner candidate who filed qualifying papers for a particular district's election but resided in another district at that time.  Grassi, 532 So. 2d at 1055.  The State sought review on the ground that section 99.032, Florida Statutes (1983), the law cited in the charging document, required that "[a] candidate for the office of county commissioner shall, at the time he qualifies, be a resident of the district from which he qualifies."  Id. at 1055-56.  This Court held that article VIII, section 1(e), already provided the requirements for office of county commissioner: "We construe this provision as requiring residency at the time of election."  Id. at 1056.  As such, the Court concluded, section 99.032 was unconstitutional because it "impose[d] the additional qualification for the office of county commissioner of residency at the time of qualifying for election."  Id.

In light of this decision, we have already determined that candidates for an office of county commissioner are constitutionally required to establish their residency within that office's district only at the time of election.  In other words, the qualification period is not the last opportunity for the candidate to move into the office's representative territory.  Notably, in interpreting article VIII, section

1(e), our decision in Grassi does not distinguish between party affiliations or types of county commissioner candidates—that is, write-ins under section 99.0615; those who pay a qualifying fee under section 99.092, Florida Statutes (2014); or someone seeking to qualify by the petition process under section 99.095, Florida Statutes (2014). Thus, it is evident that the constitutional eligibility requirement of residency at the time of election applies to every county commissioner candidate.

The law at issue in this case is strikingly similar to the one invalidated in Grassi. Section 99.0615, Florida Statutes, dictates that "[a]t the time of qualification, all write-in candidates must reside within the district represented by the office sought." Thus, under Florida law, "write-in candidates must reside within the district at an earlier point than other candidates—the time of qualification." Matthews v. Steinberg, 153 So. 3d 295, 297 (Fla. 1st DCA 2014). This directive retracts the constitutionally-delineated deadline, by which a write-in candidate vying particularly for an office of county commissioner must demonstrate residency within that office's district, and reasons that the statute impermissibly imposes a residency requirement in addition to that prescribed by article VIII, section 1(e), of the Florida Constitution. See Grassi, 532 So. 2d at 1056; Wilson, 223 So. 2d at 735-36.

Accordingly, we conclude that the Fourth District correctly determined that section 99.0615, Florida Statutes, is facially unconstitutional.

**Closing of the Democratic Party's Primary Election**

Finally, Brinkmann argues that even if section 99.0615 is unconstitutional, the Fourth District still erred in closing the Democratic Party's primary election on its flawed determination that write-in candidates like Francois are "opposition" under article VI, section 5(b), of the Florida Constitution. This issue presents a question of constitutional interpretation, also subject to de novo review. See Graham, 108 So. 3d at 603.

The rules governing statutory interpretation generally apply with equal force to the interpretation of constitutional provisions. Coastal Fla. Police Benevolent Ass'n, Inc. v. Williams, 838 So. 2d 543, 548 (Fla. 2003). Accordingly,

> this Court "endeavors to construe a constitutional provision consistent with the intent of the framers and the voters." Zingale[ v. Powell, 885 So. 2d 277, 282 (Fla. 2004)] (quoting Caribbean Conservation Corp.,[ Inc. v. Fla. Fish & Wildlife Conservation Comm'n, 838 So. 2d 492, 501 (Fla. 2003)]). In ascertaining the intent of the voters, the Court may examine "the purpose of the provision, the evil sought to be remedied, and the circumstances leading to its inclusion in our constitutional document," In re Apportionment Law—1982, 414 So. 2d [1040, 1048 (Fla. 1982)], with the view that a constitutional amendment must be assessed "in light of the historical development of the decisional law extant at the time of its adoption." Jenkins v. State, 385 So. 2d 1356, 1357 (Fla. 1980).

In re Senate Joint Resolution of Legislative Apportionment 1176, 83 So. 3d 597, 614 (Fla. 2012).

Still, "[a]ny inquiry into the proper interpretation of a constitutional provision must begin with an examination of that provision's explicit language. If

- 10 -

that language is clear, unambiguous, and addresses the matter in issue, then it must be enforced as written." Fla. Soc'y of Ophthalmology v. Fla. Optometric Ass'n, 489 So. 2d 1118, 1119 (Fla. 1986). Indeed, "the law is settled that when constitutional language is precise, its exact letter must be enforced and extrinsic guides to construction are not allowed to defeat the plain language." Fla. League of Cities v. Smith, 607 So. 2d 397, 400 (Fla. 1992). "[U]nless the text of a constitution suggests that a technical meaning is intended, words used in the constitution should be given their usual and ordinary meaning because such is the meaning most likely intended by the people who adopted the constitution." Lawnwood Med. Ctr., Inc. v. Seeger, 990 So. 2d 503, 512 (Fla. 2008). This Court has advised that "a dictionary may provide the popular and common-sense meaning of terms presented to the voters." Id. (quoting Advisory Op. to Governor—1996 Amendment 5 (Everglades), 706 So. 2d 278, 282 (Fla. 1997)). Constitutional provisions should be provided "a broader and more liberal construction" but not construed "so as to defeat their underlying objectives." Coastal Fla. Police Benevolent, 838 So. 2d at 549 (quoting Fla. Soc'y of Ophthalmology, 489 So. 2d at 1119) (internal quotation marks omitted). Finally, it should be noted that this Court champions a strong public policy against judicial interference in the democratic process of elections. Fla. League of Cities, 607 So.

2d at 400.  Bearing these principles in mind, we first turn to the constitutional provision at issue.

## Universal Primary Amendment

The Universal Primary Amendment (UPA) was passed in the 1998 general election and amended article VI, section 5, Florida Constitution, to state, "If all candidates for an office have the same party affiliation and the winner will have no opposition in the general election, all qualified electors, regardless of party affiliation, may vote in the primary elections for that office."  Art. VI, § 5(b), Fla. Const.; accord Telli v. Snipes, 98 So. 3d 1284 (Fla. 4th DCA 2012).

Two courts have determined that a write-in candidate constitutes "opposition" for purposes of opening a primary election under the UPA.  See, e.g., Lacasa v. Townsley, 883 F. Supp. 2d 1231, 1242-43 (S.D. Fla. 2012).  In Telli, three candidates were qualified to run in the Democratic Party's 2012 primary election for the Office of Broward County Commissioner.  Two other candidates— one Democrat and one Republican—also qualified particularly as write-in candidates and were represented in the November 2012 general election by a blank line on the ballot.  A Republican-registered voter filed suit to open the Democratic Party's primary election to all registered voters, and the trial court dismissed the suit with prejudice.  Telli, 98 So. 3d at 1285.

The Fourth District affirmed, holding "that the language of the UPA is 'unambiguous' and that write-in candidates are both 'candidates' and 'opposition' within the meaning of the UPA's unambiguous language." Id. at 1286. The district court found that "Florida's statutory definition of 'candidate' includes write-in candidates." Id. at 1286 (citing § 97.021(5)(b), Fla. Stat. (2012) (" 'Candidate' means any person to whom any one or more of the following applies: . . . (b) Any person who seeks to qualify for election as a write-in candidate.")). It further rejected the plaintiff's insistence that write-in candidates were not viable competition.

> [This] Court will not consult a crystal ball to determine when and whether a given write-in candidate constitutes "real" or mere illusory opposition. The question is not whether [the write-in candidates] will likely prevail in the general election over the winner of the Democratic Party (or even garner a significant percentage of the vote), but whether, under the current framework set forth by the Florida Constitution, they could.

> Lacasa, 883 F. Supp. 2d at [1243] (emphasis [in] original). Under the current framework, a write-in candidate could prevail in the general election, provided he or she receives the most votes.

Id. at 1287.

The Telli court's interpretation of the UPA's plain language is consistent with the common usage of "opposition" and related terms around the time the amendment was adopted. According to dictionary definitions, "opposition" meant "a position confronting another or placing in contrast; that which is or furnishes an

- 13 -

obstacle to some result." Black's Law Dictionary, 1093 (6th ed. 1990). It was also defined as an "act of opposing," a "hostile or contrary action or condition," and "something that opposes," or "a political party opposing and prepared to replace the party in power." Merriam-Webster's Collegiate Dictionary 816 (10th ed. 1998). The act of "opposing" was "appli[cable] to any conflict" and synonymous with "set[ting] oneself against someone or something." Id. Conversely, someone or something was "opposed" if he, she, or it was "set or placed in opposition." Id. Additionally, an "opponent" was "one that takes an opposite position (as in a debate, contest, or conflict)." Id. at 815.

From these definitions, it appears that the usual and ordinary meaning of "opposition" as intended by the people who adopted the UPA contemplated an individual qualified to compete against a political party's primary winner in hopes of prevailing in a contest for public office. This naturally encompasses a write-in candidate—especially considering that subsection (b) does not specify the type of "opposition" one must encounter in a general election.

Brinkmann maintains that interpreting "opposition" to include write-in candidates would not coincide with the UPA's intended purpose. Specifically, she argues that the amendment was adopted in order to allow all registered electors to vote in a primary election when the winner of that election effectively would be the

person elected to office.  This argument overstates the UPA's purpose.  According to amendment commentary:

> The [UPA] was proposed by the Constitution Revision Commission in an effort to address the low numbers of Florida voters who participate in elections.  The Commission found that, prior to the amendment, in counties where a large majority of registered voters is registered with one political party, an election was often won at the primary level.  Members of the minority party, as well as members of minor parties and those with no party affiliation, would not have the opportunity to participate in the electoral process.

William A. Buzzett & Deborah K. Kearney, Commentary to 1998 Amendment, Art. VI, § 5.

The federal district court in Lacasa found that current election laws effectuate the UPA's purpose by giving all registered voters in a given county an opportunity to participate in the electoral process.  Writing for the court, Judge Zloch explained:

> Further, Plaintiffs' argument that the write-in candidates do not constitute "opposition" justifying the closed election is inconsistent with the structure of Florida's election laws.  If a candidate in a general election is unopposed, meaning that if there are no other candidates, whether write-in candidates or party-supported candidates, "the candidate [is deemed] to have voted for himself or herself" and thus "the names of [the] unopposed candidates shall not appear on the general election ballot."  Fla. Stat. § 101.151(7).  It is this type of primary that is, by definition, a de facto general election because there will actually be no opportunity to vote at all in the general election— the election for the office of Miami-Dade State's Attorney will be absent from the general election ballot.

- 15 -

Lacasa, 883 F. Supp. 2d at 1243.  Based on the record before it, the court found that

> the situation Plaintiffs decry here is much different.  In the November general election, all Miami-Dade County voters will have the opportunity to vote for the [sic] either the winner of the Democratic Primary . . . [or one of the two write-in candidates].  While Plaintiffs may claim that the write-in candidates are not "real" or legitimate candidates, their presence does not diminish Plaintiffs' and all other duly registered voters' right to cast a vote in the general election.

Id.

These passages demonstrate that, even in branding write-in candidates as "opposition" for purposes of closing a party's primary election, Florida's election laws still guarantee all registered electors meaningful opportunities to vote at the general election level.  Accord Telli, 98 So. 3d at 1287 ("Come November 6th, all duly-registered voters will have the opportunity to participate in the electoral process by voting for either the winner of the Democratic Primary or one of the write-in candidates; and the candidate receiving the most votes in the general election will be elected to the office of Broward County Commissioner.").  Brinkmann simply conflates the write-in candidate's chances of winning the general election with the elector's chance to participate at all in the electoral process.  See Lacasa, 883 F. Supp. 2d at 1243 (refusing to consider the likelihood of a write-in candidate prevailing, or even garnering a significant percentage of votes, in a general election).

Brinkmann further contends that "the circumstances leading to the adoption of article VI, section 5(b) were to allow all registered voters to participate in a party primary when the minority party was fielding no candidates in the general election." And, "[b]ecause a write-in candidate is necessarily not fielded by any party" Brinkmann adds, closing a primary election "solely on the basis that a write-in candidate represented by a blank space on the general election ballot is 'opposition' . . . ignores the policy behind the UPA." This position also overlooks the purpose of Florida's primary election system and, if adopted, could effectuate unintended openings of primary elections statewide.

Regarding the primary system's purpose, primary elections did not exist at common law. Wagner v. Gray, 74 So. 2d 89, 91 (Fla. 1954). Yet, article III, section 26, Florida Constitution, has historically required the Legislature "to pass laws regulating elections and prohibiting under adequate penalties all undue influence thereon from power, bribery, tumult, or other improper practice." State ex rel. Gandy v. Page, 169 So. 854, 857 (Fla. 1936). In Gandy, this Court held that

> such section of the Constitution contemplates laws regulating primary
> elections as well as general elections because of the inevitable
> relationship of the two classes of elections to each other. Thus, the
> Legislature is authorized by said section of the Constitution to enact
> laws designed to confine participations in party primary elections to
> bona fide recognized members of the political parties required by law
> to participate in such legally sanctioned and regulated primary
> elections as may be provided for by statute.

Id. Although a duly registered elector is entitled to exercise suffrage, there is a counterbalancing expectation that the elector will "comply with such other requirements of law as may be imposed upon him [or her] as a matter of policing the process by which he [or she] is authorized to cast his [or her] vote . . . ." Id. at 858; see, e.g., State ex rel. Hall v. Hildebrand, 168 So. 531, 532 (Fla. 1936) ("The primary election laws of this state clearly require participants in primary elections, whether as voters or candidates, to specially register for that purpose."); § 101.021, Fla. Stat. (2014) ("In a primary election a qualified elector is entitled to vote the official primary election ballot of the political party designated in the elector's registration, and no other. It is unlawful for any elector to vote in a primary for any candidate running for nomination from a party other than that in which such elector is registered.").

Hence, the Legislature established the primary election mechanism to permit a given political party to select a representative whom that party genuinely intended to support in a general election for public office. See Wagner, 74 So. 2d at 91; State ex rel. Andrews v. Gray, 169 So. 501, 505 (Fla. 1936). This Court has explained that

> [t]he purpose of a primary election is to give vitality to the
> constitutional guaranty of a free and untrammeled ballot by affording
> freedom of choice of candidates to the individual party voter who may
> be expected to support the party nominees at the ensuing general
> election. The honest conduct of a primary election is therefore not

- 18 -

> less important than freedom in expression of choice as between candidates on the final election is generally regarded as indispensable.

Id. Thus, primary elections are "essential to the functioning of popular free government" and "an integral part of the election machinery of this State[.]" Wagner, 74 So. 2d at 90-91.

Additionally, federal courts have identified legitimate regulatory interests that are furthered by the closing of a primary election. In Lacasa, the district court accepted the State's "proposition that keeping a political party's primary election closed will preserve the party as [a] viable and identifiable interest group[], insuring that the results of [its] primary election, in a broad sense, accurately reflect the voting of the party members." Lacasa, 883 F. Supp. 2d at 1239 (citing Clingman v. Beaver, 544 U.S. 581, 594-95 (2005)) (internal quotation marks omitted). The court further "recognize[d] the importance of . . . party building efforts and the interest in maintaining party identity." Id. at 1240 (citing Cal. Democratic Party v. Jones, 530 U.S. 567, 579 (2000)). Next, the court agreed that "maintaining a closed primary ensures that the State's registration rolls continue to accurately reflect voters' political preferences," which in turn "encourage[s] Florida citizens to vote." Id. (citing Clingman, 544 U.S. at 596). The court also deemed significant an "independent interest in the orderly operation of elections." Id. at 1240-41 (citing Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358 (1997)). Finally, while not found to be applicable in the instant case, the court

- 19 -

mentioned the State's interest in preventing "party raiding" and "excessive factionalism." Id. at 1241. We too find most, if not all, of these state interests to be prevalent in the instant case.

Further, Brinkmann's position embraces an interpretation of the UPA that would yield unintended openings of primary elections. Article VI, section 5(b) is a general law: it uniformly governs primary elections for any public office throughout the state. See License Acquisitions, LLC, 155 So. 3d at 1142 ("A law that operates universally throughout the state, uniformly upon subjects as they may exist throughout the state, or uniformly within a permissible classification is a general law.") (citation omitted) (internal quotation marks omitted). Thus, under Brinkmann's theory, members of majority parties, among others, conceivably would always be permitted to participate in a given party's primary election when the minority party fields no candidate for the general election. This would be equally true "in counties where a large majority of registered voters is registered with one political party" as it would be in counties where multiple parties account for significant percentages of registered voters. Because majority parties typically influence election outcomes, it is unreasonable to conclude that the UPA was intended to create such a loophole in election laws and authorize members of a majority party to meddle in the political affairs of another party which they "have no interest in joining or in supporting." See Lacasa, 883 F. Supp. 2d at 1238.

Based on the above, we conclude that, for purposes of opening a primary election under the UPA, the plain and obvious meaning of "opposition" includes write-in candidates. Therefore, we must determine whether the Fourth District correctly ordered the Democratic Party's primary election to be closed.

## This Case

Under Florida law, a primary election for public office will not be opened to all registered voters unless two conditions are met: "(1) all candidates for the office must have the same party affiliation; and (2) the winner of the primary will have no opposition in the general election." Telli, 98 So. 3d at 1286 (citing art. VI, § 5(b), Fla. Const.). Both prongs contemplate that each candidate has met the qualification requirements set forth under Florida Statutes and thereby has been duly qualified for the office sought. See Lacasa, 883 F. Supp. 2d at 1241.

Here, the record reflects that five candidates qualified by filing a fee or submitting a petition to run in the Democratic Party's primary election in August 2014: Lisa Aronson, Mark Bogen, Carmen Jones, Charlotte E. Rodstrom, and Terry Williams-Edden. The record also reflects that Francois, a sixth candidate who qualified by the write-in process, was a registered Democrat at all relevant times. Therefore, all candidates for the Office of Broward County Commissioner, District 2, shared the same party affiliation. Cf. id. at 1241-42 (concluding that UPA would not work to open the Democratic primary for the state attorney's office

to all registered voters because three candidates were registered Democrats but one of the two write-in candidates was a registered Republican).

Nevertheless, Brinkmann cannot satisfy the second prong necessary for opening a primary election. Because we have determined today that section 99.0615, Florida Statutes, is facially unconstitutional, the fact that Francois did not live within District 2 at the close of the qualification period is not dispositive. Francois testified that he intended to move into the district if he won the general election. The parties do not otherwise dispute whether he failed to satisfy other eligibility requirements as prescribed under Florida law. Thus, the circumstances of this case are such that the primary winner was opposed by a duly qualified write-in candidate in the November 2014 general election.

Accordingly, we conclude that it was appropriate and constitutionally mandated for the Democratic Party's primary election to be closed to only Democratic-registered voters.

## CONCLUSION

For the foregoing reasons, we affirm the Fourth District's decision in Francois.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, and QUINCE, JJ., concur.
CANADY and POLSTON, JJ., concur in result.

- 22 -

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

An Appeal from the District Court of Appeal – Statutory or Constitutional Invalidity

      Fourth District - Case No. 4D14-2739

      (Broward County)

William R. Scherer of Conrad & Scherer, LLP, Fort Lauderdale, Florida; Bruce S. Rogow and Tara A. Campion of Bruce S. Rogow, P.A., Fort Lauderdale, Florida,

      for Appellant

Robert C. L. Vaughan of Kim Vaughan & Lerner, LLP, Fort Lauderdale Florida; Mark Herron, Robert J. Telfer, III, and Joseph Brennan Donnelly of Messer Caparello, P.A., Tallahassee, Florida,

      for Appellee Tyron Francois